**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RAVE INC.,<br>*Plaintiff*,<br>v.<br>APPLE INC.,<br>*Defendant*. | **Civil Action No. ______________**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1. This is the story of one of the world's largest technology companies using its market dominance to crush a competitor, expand its monopoly power, and further entrench its control of smartphones. Rave brings this suit to stop Apple's anticompetitive campaign, restore competition among co-viewing applications for the benefit of consumers, and recover hundreds of millions of dollars in damages.

2. In 2015, Rave and its team of twelve launched a software application—the Rave app—to transport users into a virtual "watch room," where users can connect, converse, watch movies and television, listen to music, and spend time together from any device, at any time, from anywhere. The Rave app developed a dedicated base of users across iPhone and non-iPhone devices in the years leading up to the COVID-19 pandemic, when active users of the app surged nearly 800 percent in a matter of weeks. In response, Apple began quietly developing its own watch-room feature—one that would be exclusive to the iPhone and other Apple devices. By 2021, Apple launched its competing product, SharePlay, and then began a steady campaign to ensure Rave could no longer compete. In 2025, Apple moved to kill the Rave app by weaponizing Apple's App Store against Rave and monopolizing smartphone co-viewing watch room experiences.

3. The Rave app allows users to engage in live conversation while simultaneously streaming their favorite movies, television, and music—replicating the dynamic, social environment of an in-person watch party within the Rave app's virtual watch rooms. At the peak of its popularity, more than one million people had built the Rave app into their daily social routine, spending an average of 1.5 hours daily co-viewing content with other users. Since its debut, the Rave app has been downloaded more than 225 million times.

4. The Rave app helps users create, explore, and sustain a community based on shared interests. Central to that goal is Rave's cross-platform design, which allows the app to be enjoyed by as many users as possible. Users do not need to purchase a new device or subscribe to a new content service to join a Rave watch room. Instead, with the device of their choice and the login credentials for their preferred streaming service, users can host or join watch rooms with family and friends—or explore public watch rooms and forge new relationships—at any time, from anywhere, on any device.

5. Apple, which maintains a monopoly in the markets for smartphones and performance smartphones, has long recognized that cross-platform services like the Rave app provide the same user experience regardless of which device a user has. These apps reduce the burden of switching smartphone devices, making the iPhone ecosystem less "sticky." Apple, which earns more than 50 percent of its revenues each year from iPhone sales and has built an empire of high-margin products and services tied to the iPhone, acknowledges in internal company emails and presentations that these cross-platform technologies weaken the iPhone's singularity in the user's life and threaten the monopoly profits Apple extracts from users locked into the iPhone ecosystem.

6. As more users turned to the Rave app during the COVID-19 pandemic to stay connected with friends and family, it became clear that smartphone co-viewing was not a niche experience for a small group of users, but a rapidly growing social phenomenon. Almost immediately, Apple began leveraging its dominance to crush Rave and monopolize the smartphone co-viewing market for itself.

7. These efforts began with Apple manipulating back-end controls in the App Store to slow the Rave app's user acquisition and curb its daily downloads. Around the same time, Apple launched its own competing co-viewing feature, SharePlay. But unlike Rave's cross-

platform, device-agnostic product, SharePlay was developed exclusively for Apple devices, limiting smartphone co-viewing to iPhone users only and encouraging those users to purchase more products in the Apple ecosystem to take advantage of the full SharePlay experience. Then, in the summer of 2025, with the Rave app's popularity at an all-time high, Apple eliminated Rave—the only viable competitor to SharePlay in the smartphone co-viewing market—removing the app from the App Store and revoking Rave's developer credentials.

8. Rave's experience is not unique among app developers. Apple has repeatedly weaponized its monopoly power against apps with cross-platform capabilities that bridge the technical divide between the iPhone user experience and that of competing smartphones. Apple does so because it fears a reality in which the App Store developers on whom it has profited for two decades will threaten Apple's continued stream of monopoly profits from iPhone users.

9. In addition to iPhone sales, these monopoly profits are generated in at least two ways. Through the commissions it imposes on in-app purchases, Apple forces developers to hand over as much as 30% of revenue per transaction in exchange for access to the 1.5 billion global users on the iOS platform. This revenue stream is remarkably profitable for Apple, with App Store operating margins exceeding 75 percent. A less obvious—but critical—way that Apple leverages its App Store is by monitoring rival app innovations with potential strategic importance. Apple will identify threats to its continued monopoly profits, create a copy of the feature for itself that supports other Apple-exclusive paid products and services, and then eliminate competition from the rival app. This anticompetitive playbook is known as "Sherlocking"—Apple exploits control over the App Store to throttle the rival app's growth, disrupt its performance, and/or throw it out of the iOS ecosystem entirely. By excluding these rivals, Apple generates greater monopoly profits from iPhone users locked into the ecosystem who, as a result of Apple's misconduct, are incented to buy more Apple products and services.

10. Apple's monopoly positions in the markets for smartphones (where it controls at least 65 percent share in the United States) and performance smartphones (where it controls at least 70 percent share in the United States) allow Apple to leverage its dominance in this manner to attack disruptive competitors and monopolize the market for smartphone co-viewing applications. For example, Apple imposes technological and contractual restraints to force every iPhone customer to use Apple's App Store as the exclusive source for any iOS software applications. As a consequence, Apple's dominance in smartphones and performance smartphones harms developers and users because it establishes Apple as the intermediary between developers and users of their apps across the vast majority of smartphones. A developer who cannot remain in Apple's good graces risks being cut off from at least 65 to 70 percent of prospective consumers, a fatal outcome for the developer's business that ultimately limits user choice.

11. With a market capitalization exceeding $4 trillion, Apple's strategy is not to invest in disruptive innovations, but to discourage them. Today, Apple's commercial success depends on using its smartphone dominance to extract every possible dollar out of customers locked into the Apple ecosystem and to quash any threats to that continued stream of monopoly profits.

12. Since at least 2010, Apple's then-CEO Steve Jobs was conceiving a roadmap for Apple's modern strategy of anticompetitive self-preservation with one goal: to "lock customers further into our ecosystem." The strategy worked: Apple is now the gatekeeper to the digital lives of hundreds of millions of Americans—controlling not just the device they use, but the software and services they can (and cannot) access, and the technologies they can (and cannot) benefit from.

13. In line with Steve Jobs' roadmap, Apple needs customers to remain locked into its ecosystem to maintain its monopoly profits, and so Apple defends the iPhone's monopoly at all costs. Any erosion of Apple's stranglehold over iPhone users not only risks hundreds of billions of dollars in hardware sales, but also billions in sales from all the other products and services where Apple has leveraged its iPhone dominance to keep monopoly profits flowing, such as the App Store (and its commissions on developers' in-app sales and subscriptions), companion devices and accessories (such as AirPods, Apple Watch, AirTag, and HomePod), content and services (such as AppleTV, Apple Music, Apple Arcade, and Apple Fitness), and mobile payments (Apple Pay).

## PARTIES

14. Plaintiff Rave Inc. ("Rave" or "Plaintiff") is a corporation organized under the laws of the Province of Ontario, Canada, with a place of business in Hamilton, Ontario.

15. Rave designed and operates the world's most popular cross-platform co-viewing application, the Rave app. The Rave app enables users on different devices and different operating systems—iPhones, Android phones, Windows PCs, Macs—to watch Netflix, YouTube, Disney+, and other streaming content together in real time, with synchronized playback, text chat, and voice communication.

16. Defendant Apple Inc. ("Apple") is a corporation organized and existing under the laws of California, with a place of business in Cupertino, California. Apple designs, markets, and sells smartphones (the iPhone), personal computers (Macs), tablets (the iPad), wearables, and accessories, as well as a variety of related services. Apple also owns and operates the App Store, which is the exclusive authorized channel for developers to distribute applications to Apple's approximately 125 million to 150 million active smartphone users in the United States.

## JURISDICTION AND VENUE

17. The Court has subject-matter jurisdiction over Rave's federal claims under 15 U.S.C. § 4 and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367.

18. The Court has personal jurisdiction over Apple under 15 U.S.C. § 22. Alternatively, the Court has personal jurisdiction over Defendant under New Jersey's long-arm statute, N.J. Ct. R. R. 4:4-4, because Apple has purposefully availed itself of the privilege of conducting activities in New Jersey by selling smartphones in New Jersey (including at its 12 Apple Store locations within the State) and to New Jersey residents. In addition, Apple (1) requires iPhone users in New Jersey to use the App Store as the default and exclusive source for third-party software applications; (2) has foreclosed New Jersey iPhone users from downloading the Rave app since August 13, 2025; and (3) has hindered the functionality of the Rave app for its existing iPhone users residing in New Jersey, or otherwise obstructed such users' access to Rave updates or notifications.

19. Venue is proper in this District under 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391 because Defendant transacts a substantial volume of business in the United States and in this District, including, without limitation, selling smartphones and performance smartphones and distributing smartphone co-viewing applications to customers located in this District. A substantial portion of the affected interstate trade and commerce described herein has been carried out in this District. Defendant's conduct has harmed the United States markets for smartphones, performance smartphones, and smartphone co-viewing applications, including harming customers within this District.

20. This action is also related to and shares common questions of fact with the multi-district litigation styled as *In Re: Apple Inc. Smartphone Antitrust Litigation*, 2:24-md-03113

(JXN) (LDW) (the "MDL"). For example, both this complaint and the operative direct purchaser plaintiff complaint in the MDL allege that Apple has monopolized the markets for smartphones and performance smartphones by excluding apps that reduce the cost of switching from the iPhone to other smartphones and performance smartphones. Both complaints also allege that Apple maintains its monopoly by, for example, exploiting its control of the App Store to thwart competition using a morass of rules and restrictions as a pretext. And both complaints detail how Apple uses these restrictions to extract monopoly rents from third parties in a variety of ways, including app fees and revenue-share requirements. Proceeding in this District will further the convenience of the parties and witnesses and promote the just and efficient conduct of this action.

21. Plaintiff has standing to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

22. Because Apple sells smartphones and Rave makes the Rave app available throughout the United States, across state lines, and internationally, Apple's conduct substantially affects interstate commerce.

## FACTUAL ALLEGATIONS

### A. The Evolution Of Online "Third Spaces"

23. The rise of personal computing and mobile smartphones led to the creation of online spaces where relationships and communities are built, maintained, and thrive.

24. In the early 1980s, even before access to the world wide web, the first public, online chatrooms appeared. These digital spaces allowed users to join channels and send messages in real time, setting the stage for modern day social media networks.

25. As the general public gained access to the internet in the early 1990s, chat rooms exploded in popularity, giving rise to America Online (AOL) messenger and similar services

designed to send direct messages between individual users. These platforms became popular in part because they were available on multiple operating systems—including Windows, macOS, and Unix—meaning users were not constrained to interacting with only users on like-devices.

26. Web-based chat and messenger services faded with the rise of smartphones and the transition to mobile computing, as these spaces began competing with native software messaging applications that put instant messaging in users' pockets.

27. Eventually, direct messaging and chat rooms paved the way for social media platforms. In addition to sharing their thoughts, users could now use digital webpages to share videos, photos, and other personal interests.

28. Unlike passive browsing on social media, online third spaces are built around conversation, shared rituals, and real-time interactions. These spaces are available all day, every day, and are unconstrained by geographic barriers. Online communities bridge the gap between digital and real-world space, allowing real-world friendships and relationships to flourish where they otherwise could not.

**B. Rave Creates Virtual Environments For Building Real Communities**

29. Rave was founded in 2013. In 2015, Rave created and published the Rave app, a first-of-its-kind, cross-platform co-viewing app for iOS, Android, Windows, and Mac. Because of this cross-platform functionality, the Rave app can be classified as a "super app." In broad terms, a "super app" is a type of app that is not dependent on a particular smartphone operating system and, therefore, enables users to access the same experience without being locked into a particular device.

30. The Rave app provides broad functionality to support virtual watch rooms that serve as the next generation in digital third spaces. With just an internet connection, users can join friends and family in watch rooms from any device to watch and discuss movies, TV shows,

music, and other streamed media in real time, as if gathering in-person. To enable this social dynamic, Rave's watch rooms include voice and text tools that support users' conversations alongside the streamed content. With these communication features, the Rave app doubles as a cross-platform messaging app, which allows users to keep conversations going even after the credits stop rolling. As alleged by the U.S. Department of Justice (the "DOJ") and twenty State Attorneys General in their pending suit against Apple, Apple has exhibited hostility to apps that—like the Rave app—provide users with broad functionality.

31. Rave's watch rooms allow users to stay connected with friends and family or to build new relationships. The Rave app also allows users to create private rooms, invitation-only environments intended to keep friends and families together even at a distance, or public rooms, which users can explore to find new friends with shared interests anytime, from anywhere, on any platform.

32. Rave supports the broadest library of content sources of any smartphone co-viewing app, including integrations with Netflix, Disney+, YouTube, Prime Video, HBO Max, and Crunchyroll. The Rave app accesses these major streaming services with per-user authentication with each user's own credentials, ensuring compliance with platform and digital rights requirements while offering users the ability to access their subscription content across sources.

33. Because the Rave app works with a user's existing smartphone and streaming service credentials, and Rave is supported through in-app advertising, its users can host or join a watch room without any added charge. Although Rave offers an optional, ad-free experience for a modest subscription fee, and has plans to implement a "VIP"-tier subscription model that would give subscribing users access to high-value premium features, Rave does not offer

microtransactions or in-app purchases. As a result, the Rave app is free for the vast majority of its users.

34. To deliver a low-cost, high-quality, smartphone co-viewing experience to users, Rave had to first overcome persistent technical barriers that prevented larger, would-be competitors, including Disney and Amazon, from launching their own cross-platform co-viewing solutions.

35. Among Rave's many technical accomplishments, Rave pioneered industry-leading technology capable of syncing playback on devices globally with near-perfect accuracy. Users in a watch room can experience the same frame at the same moment, while communicating through integrated text chat and voice features. This synchronization is key to preserving the social experience of co-viewing by preventing "spoilers," i.e., instances where User A reacts to a scene before User B is able to see it. The Rave app's synchronization is so precise that multiple devices in the same physical room can function as a single speaker system.

36. Rave did not just build a video tool, but also a dynamic social experience. Users create accounts, build friends lists, send direct messages, create and join watch rooms, and form communities around shared viewing interests, all within the app itself. Rave's cross-platform functionality means that users can connect seamlessly with friends using a different device, without sacrificing app performance.

37. Since its founding, Rave has worked to cultivate a dedicated user base, but its popularity soared in March 2020, as social distancing measures implemented during the COVID-19 pandemic fractured communities and disrupted nearly every aspect of daily life. The acute isolation of the pandemic accelerated demand for remote social activities, including smartphone co-viewing. In a matter of weeks, the Rave app experienced a nearly 800 percent increase in

active users, propelled by users' natural desire for social connection and to establish a "new normal" routine.

38. Interest in the Rave app and smartphone co-viewing has continued in the post-COVID world, with total monthly active users increasing from 6.1 million in 2021, to 8.5 million in 2024. Because of this organic growth, Rave has never had to resort to paid user acquisition or paid advertising campaigns.

39. Rave has invested substantially to ensure its user experiences are functional, satisfying, and secure. Rave has implemented a number of industry-leading safety measures to protect users from fraudulent or dangerous accounts, including automated bots, that attempt to infiltrate and exploit Rave's watch rooms or messaging functions to distribute inappropriate, abusive, or spam content to users.

40. Among its many safety protocols, Rave has integrated facial age verification into the Rave app to prevent children from accessing mature content, consistent with child protection measures recently implemented in several U.S. states as well as the European Union.

41. Rave takes a proactive role in detecting and eliminating harmful user-generated content in its app. To improve user safety and promote positive in-app experiences, Rave deploys sophisticated artificial intelligence ("AI") moderation technology to scan all user chats for inappropriate, adult, or illegal content. This model is capable of compiling a bad actor's entire interaction history into a "Case File" so that harmful accounts can be identified and removed. Rave's "Sticky Ban" protocol ensures that banning one account permanently bans all linked accounts and devices, preventing bad actors from returning to the app with new credentials. As of early May 2026, this system had permanently removed over 120,000 malicious accounts from the Rave app.

42. Rave has also developed and implemented a proprietary image classification system to detect harmful content with as high as 99.87% accuracy for detecting harmful or unlawful content.

43. For fiscal years 2023 and 2024, Rave's content moderation system development was formally recognized by the Canadian government as qualifying scientific research under the Scientific Research and Experimental Development (SR&ED) tax incentive program. This means that after reviewing Rave's SR&ED application, the Canada Revenue Agency determined that Rave was engaged in genuine scientific research to advance technologies to improve the detection of harmful content.

44. Rave's pioneering content moderation systems are so advanced that Rave markets them to other platforms. Services include image and video content moderation, user behavior analysis and moderation, and facial age verification.

**C. Apple Takes Notice After The Rave App Launches On iOS In 2015**

45. The Rave app was published on the App Store in January 2015. In March 2015, an Apple employee proactively reached out to Rave's CEO, praising the app.

46. From that point on, Rave's contacts with Apple spanned at least seventeen Apple employees across seven departments: App Store Business, Marketing Partnerships, Developer Relations, iTunes Legal, Apple Retail Business, Apple Search Ads, and Apple Ads (Emerging).

47. As Rave's user base expanded between 2020 and 2021, Apple's Search Ads team began exploring advertising and monetization opportunities with Rave. At formal business development meetings with Rave's executives, Apple representatives complimented the app and described Rave's Disney+ integration as "incredible."

48. In January 2024, Apple proactively recruited Rave for Apple Vision Pro development, setting up a meeting between its Partnership Manager for Worldwide Developer Relations and Rave's CEO titled "Rave & Apple: visionOS compatibility mode."

49. In 2025, Rave met with a Client Strategist for Apple Ads' Emerging Team to discuss potential advertising spend of approximately $1 million.

50. In the ten-year history of interactions between Rave and Apple since the Rave app was first published on the App Store, Apple employees repeatedly praised Rave's many technological successes and user appeal, and sought ways for Apple to generate more profits through the monetization of the Rave app. None of these employees signaled to Rave that Apple intended to develop a competing product.

**D. Tech Giants Try And Fail To Replicate Rave's Success**

51. Major companies like Disney and Amazon attempted to develop their own co-viewing offerings after the success of Rave.

52. These competitors assumed that with a few additional features, their existing content catalogs could serve as the foundation for fully social experiences, and that with a cross-platform solution, these competing co-viewing apps could reach as many potential users as possible. Competitors recognized co-viewing applications as a significant commercial opportunity, with potential to attract significant volumes of new subscribers. Ultimately, despite their resources, these companies could not replicate the Rave app's technical successes or generate the same widespread user appeal.

53. Disney promoted (and ultimately discontinued) Disney+ GroupWatch. The features were basic, restricted to a single platform (Disney+ content only), and lacked voice chat. It was quietly discontinued in September 2023 due to technical limitations and lack of cross-platform capability.

54. Amazon Prime Video created "Watch Party," which allowed Prime subscribers to engage with Prime content through desktop browsers. Amazon extended Watch Party to its mobile app in July 2021, but wound down both the mobile and desktop products in early 2024.

55. Twitch, owned by Amazon and one of the largest companies in live streaming, likewise discontinued its "Twitch Watch Parties" co-viewing feature in April 2024, due to "low usage."

56. Of the limited co-viewing platforms available today, none offer comparable content options or features to the Rave app. For example, Hulu Watch Party is a web-only feature without mobile support or voice chat. Similarly, Teleparty exists primarily as a web browser extension, with no voice chat, very limited social features, and basic support for only a handful of streaming services on mobile.

57. To date, there is no current or discontinued co-viewing solution that can match Rave's innovative features. Notably, in addition to building the only true cross-platform smartphone co-viewing experience, Rave solved at least three enterprise-grade problems that stymied other would-be competitors: (1) synchronization across different device types and networks; (2) multi-source aggregation of major streaming services—including Netflix, YouTube, Disney+, Amazon Prime Video, HBO Max, and Crunchyroll; and (3) a robust social layer for messaging and voice chat.

### E. Apple Has Built An Empire By Locking Users Into Its Device Ecosystem And Locking Out Competitors Who Could Disrupt Its Dominance

58. Once considered an upstart, Apple is now one of the most powerful companies in the world. Apple acquired and now maintains its monopoly position in the smartphone market not by making its product more attractive to users, but by making it harder and more expensive for them to leave the Apple product ecosystem.

59. Multiple Apple executives have embraced this anticompetitive business model, as illustrated in public statements and internal documents made public in prior litigations. For example, Apple CEO Tim Cook, in a now-infamous response to a reporter complaining that the lack of interoperability between Android and iPhone meant he could not send videos to his Android-user mother, replied: "Buy your mom an iPhone." Apple is not only aware of these interoperability issues, it deliberately exploits them to preserve its own monopoly position. As indicated by internal company emails, when one Apple employee suggested bringing iMessage to Android to improve user experience, Craig Federighi, Apple's SVP of Software Engineering, responded: "iMessage on Android would simply serve to remove [an] obstacle to iPhone families giving their kids Android phones." Another Apple executive, Phillip Schiller, agreed: "Moving iMessage to Android will hurt us more than help us." Internal Apple board presentations acknowledge the acute threat posed by apps and technologies that reduce barriers to user switching, calling these competitors "barbarians at the gate" and identifying the "undifferentiated user experience" offered by cross-platform apps as a "major headwind" because it creates "low stickiness" and "low switching cost."

60. Today, Apple's ecosystem includes hardware, apps, content, accessories, and services that are offered by third-party developers, content creators, publishers, banks, advertisers, social media companies, retailers, and other merchants. As Apple's monopoly power has grown, the options developers have to reach smartphone users have shrunk. As a consequence, Apple has been able to leverage its dominance in anticompetitive and exclusionary ways to control how third parties innovate, monetize, and interact with users.

61. Through a web of contractual and technical restrictions selectively enforced via its exclusive control of app distribution, its "app review" process, and its authority to grant or deny access to critical iOS architecture (Application Programming Interfaces or "APIs"), Apple

forecloses from the marketplace apps that threaten to reduce user switching costs and erode the dominance of the iPhone, particularly cross-platform apps. As noted by Apple's former Senior Director of App Review, Phillip Shoemaker, "[i]n the early years, the App Store was a feature of the iPhone. It existed to make the device more valuable" whereas today "[s]ervices is now a $100B+ business and the second-largest line item on Apple's income statement." As a result, Mr. Shoemaker explains, "[t]he reviewer's job is to defend [Apple's App Store] commission, defend the rule structure that protects the commission, and defend Apple's interpretive authority over both."

62. Apple's conduct of wielding its App Store as a weapon has drawn scrutiny from numerous private plaintiffs as well as the DOJ and twenty State Attorneys General, who are suing Apple in this Court for "imposing a series of shapeshifting rules and restrictions in its App Store guidelines and developer agreements that would allow Apple to extract higher fees, thwart innovation, offer a less secure or degraded user experience, and throttle competitive alternatives."[1]

63. Developers have long accused Apple of exploiting these guidelines to eliminate apps that threaten Apple's monopoly profits or the stickiness of its ecosystem, often by shifting the interpretation or enforcement of certain provisions to provide pretextual cover to remove an app that was previously deemed compliant. For example, in 2017, it was reported that a "Finder for AirPods" app was removed from the App Store because, according to the app's developer, Apple "didn't like the 'concept' of people finding their AirPods," as opposed to paying for a new pair. While "Finder for AirPod" was deemed "not appropriate for the App Store," similar finder

[1] Amended Complaint, *United States v. Apple Inc.*, Case No. 2:24-cv-04055 (D.N.J) (June 11, 2024), ECF No. 51 at 4.

apps such as one for Fitbit and Jawbone (other Bluetooth-enabled wearables) remained available in the App Store.

64. According to the Investigation of Competition in Digital Markets by the U.S. House Judiciary Subcommittee on Antitrust, Commercial and Administrative Law ("2020 Congressional Report"), when "Apple introduces a new app, developers with rival apps know they may be targeted for a violation of a rule Apple has suddenly decided to interpret or enforce differently." For example, as described in the same 2020 Congressional Report, in 2020 Apple shifted the distinction between "business" and "consumer" apps to justify its decision to require developer Basecamp to redesign its app to include Apple's in-app payments flow—thereby entitling Apple to fees based on each transaction. One app developer noted that because the Guidelines are "constantly shifting," Apple "arbitrarily decides when an app no longer complies with the rules, and those decisions always favor Apple's interests."

65. As alleged in the DOJ case, Apple has developed a pattern of exclusionary conduct to, in the words of one Apple manager, avoid a smartphone market where "all that matters is who has the cheapest hardware" and consumers could "buy[] a [expletive] Android for 25 bux at a garage sale and . . . have a solid cloud computing device."

66. Apple knows it cannot sustain its monopoly profits in a world where users can access the same functionalities and features of an iPhone through a super app or other third-party program. First, because these programs are not device-restricted, and the experience can transfer seamlessly to a non-Apple device, they weaken Apple's ability to further lock in existing iPhone users, and thereby reduce the stickiness that Apple depends on to extract more profits from users. Second, because these programs are designed for interoperability across platforms, they also reduce the friction an iPhone user experiences when interacting with a non-iPhone user, and thereby limit the pressure on non-iPhone users to switch to iPhone.

67. The Rave app is precisely the kind of cross-platform technology that threatens Apple's iPhone dominance. The Rave app provides its users with a rich, self-contained social community that functions identically regardless of the underlying device being used, making the operating system irrelevant to the user's social engagement on the app.

68. A cross-platform co-viewing app like the Rave app does not merely reduce switching costs for existing iPhone users considering Android—it reduces the pressure on first-time smartphone buyers to purchase the same kind of device as their friends and family. Without the Rave app, a teenager whose friends use iPhones feels compelled to buy an iPhone or be excluded from group watching. But with the Rave app, the choice of phone is irrelevant—the co-viewing experience is identical on every device.

69. In the United States, Apple requires its approximately 125 million to 150 million iPhone users to obtain iPhone apps exclusively from the App Store and restricts developers from making iOS apps available through any other channel. Apple has final say over which apps may be selected for the App Store and whether they remain there. Moreover, Apple can restrict the types of functionality developers can build for iOS, including interoperability, i.e., instances where iPhones are compatible with rivals' products and services.

70. To discourage user switching, Apple also restricts the information that developers can share with users within iOS apps. In particular, Apple's developer policies prohibit developers from referencing competing non-iOS platforms inside their iOS apps. These rules complement Apple's technical suppression mechanisms so that even when a cross-platform app exists on the App Store, Apple prohibits the developer from communicating to users that the app may be accessible from another device.

71. Apple insiders have confirmed that its app review guidelines are less about security for Apple's users and instead geared toward securing Apple's monopoly profits. For

example, in an interview published in the 2020 Congressional Report, Phillip Shoemaker stated that “Apple has struggled with using the App Store as a weapon against competitors”; Apple’s senior executives would find “pretextual reasons to remove apps from the App Store, particularly when those apps competed with Apple services”; and Apple creates “unwritten rules” to block apps it dislikes while whitelisting partners who generate significant revenue.

72. Mr. Shoemaker explained a scenario during his time at Apple when an app developer “proposed an innovative way to wirelessly sync the iPhone and Mac.” Even though the app “did not violate any of Apple’s Guidelines,” it was “rejected from the App Store nonetheless” only for Apple to “then appropriat[e] the rejected app’s feature for its own offerings.” Mr. Shoemaker reiterated that it is “inaccurate to say Apple does not favor its own apps over third-party apps” and “apps that compete against Apple’s services often have problems getting through the App Store’s review process.”

73. Apple’s own Head of Fraud Engineering, Eric Friedman, described App Review internally as “more like the pretty lady who greets you with a lei at the Hawaiian airport than the drug sniffing dog.” Because Apple concedes that App Review is arbitrary and superficial, the App Review process can be influenced on non-security considerations and used as a pretext for other motives, such as protecting Apple’s competitive interests over rivals.

74. For this reason, Apple has taken inconsistent positions with respect to defending its app review procedures—when convenient, Apple has insisted that it retains contractual rights to terminate any developer account for any reason, but when not, Apple insists that it abides by a neutral and objective set of review criteria for the purpose of safeguarding user privacy and security.

### F. Apple's "Sherlocking" Playbook: Apple Exploits The iPhone's Dominance To Exclude Competition For Other Technologies

75. Even before the launch of the iPhone, Apple developed a reputation for replicating the features of a popular third-party product, restricting that product's growth, and ultimately putting the third-party developer out of business. For twenty years, industry experts have called this practice "Sherlocking"—so-named after Apple's systematic replication and replacement of Karelia Software's "Watson" software program, with Apple's proprietary MacOS feature, "Sherlock."

76. After the launch of the iPhone, Apple adapted its "Sherlocking" playbook for iOS, exploiting its control of the App Store's search algorithms, editorial placements, and distribution infrastructure to artificially suppress competing apps.

77. "Sherlocking" is not a practice of plucking an idea from the marketplace to improve upon it through competition on the merits. Sherlocking is a process through which Apple anticompetitively exploits its dominant position as a monopolist: Apple copies a third-party developer's idea, uses that idea to create its own competing product, and simultaneously impedes the original developer's growth opportunities by manipulating the controls built into its own platform.

78. Apple's App Store ranking algorithm determines whether users discover an application at all. Evidence disclosed in Apple's recent legal fight with Epic Games confirms that Apple possesses manual controls within the App Store that it uses to fix product rankings and disadvantage competing apps. For example, as internal Apple emails reveal, Apple took steps to boost its own "Files" app above rival app Dropbox in organic search results.

79. App Store search rankings are just one of many ways that Apple suppresses rival developers on the App Store. When Apple launched its Screen Time feature in 2018, it also removed or suppressed nearly a dozen popular, third-party parental control apps that competed

with Screen Time. A 2019 New York Times investigation reported that Apple removed or restricted 11 of the 17 most-downloaded parental control apps, including OurPact, Kaspersky Safe Kids, Kidslox, Qustodio, and Mobicip. Apple provided only vague, pretextual justifications for removing the apps—branding them uniformly as "highly invasive"—without an assessment of the actual risk profile of each app. Apple reversed its ban two months later in June 2019, coinciding with news that the DOJ would be investigating Apple in connection with the federal government's antitrust probe of large technology companies.

80. Apple has also leveraged its monopoly over the iPhone platform to gain a competitive advantage in companion hardware products like smart watches and pairable Bluetooth-enabled accessories. Tile Inc., a manufacturer of Bluetooth tracking devices, testified to Congress twice to explain how Apple removed Tile from Apple Stores during the 2019 holiday season, poached a key Tile engineer, launched FindMy with "nearly identical" features, and restricted Tile's access to location permissions while exempting its own FindMy app. The 2020 Congressional Report later validated Tile's concerns and concluded that Apple's FindMy "would continue to put Tile . . . at [a] competitive disadvantage."

81. In addition to leveraging behind-the-scenes technical privileges granted by its monopoly position, Apple also leverages the social and business advantages that flow from dominant market status. Many developers, including developers for Luna Display (which makes software to convert iPads into second monitors and graphics tablets) and Masimo Corp. (a health monitoring company), alleged that prior to launching a copycat Apple-branded product, Apple took meetings with them under the guise of developer support and cooperation. Apple then later used the information acquired from these meetings to benefit its own product development. Indeed, Steve Jobs admitted that Apple has "always been shameless about stealing great ideas."

### G. With SharePlay, Apple Makes Rave The Latest Victim Of "Sherlocking"

82. In 2021, Apple began to deploy its well-worn, anticompetitive "Sherlocking" playbook against Rave. As it had done for many years with other victims, Apple attempted to copy Rave's co-viewing features in SharePlay, but with one key exception: SharePlay requires all participants to own Apple devices.

83. At its Worldwide Developers Conference ("WWDC") in June 2021, Apple announced SharePlay—a feature enabling synchronized media viewing during FaceTime calls. In the ensuing years, Apple systematically expanded SharePlay. These updates began with extensions to Messages (iOS 16, September 2022), and then to AirDrop (iOS 17, September 2023). SharePlay was the flagship use case for Apple Vision Pro (visionOS 1.0, February 2024), and then extended to HomePod and Apple TV (announced at WWDC in June 2024), CarPlay (announced at WWDC in June 2025), and most significantly, ordinary phone calls (announced at WWDC in June 2025). By the time iOS 26 shipped in September 2025, SharePlay was woven into virtually every communication pathway on Apple's mobile devices: FaceTime, iMessage, calls, wearables, speaker systems, and CarPlay.

84. SharePlay works exclusively with other users of Apple devices and is not interoperable with users of non-Apple devices. As a result, an iPhone user cannot use SharePlay for co-viewing with a user on an Android device.

85. SharePlay gains an unfair competitive advantage through preferential access to Apple's iOS ecosystem. Apple built SharePlay as the default smartphone co-viewing experience on iPhone before expanding it to Apple's broader ecosystem of iPhone-enabled personal and home devices. Whereas third-party developers must market an attractive value proposition to encourage users to download and install their apps, SharePlay is a built-in feature of the operating system and pre-installed on every iPhone—whether users want it or not. SharePlay

cannot be uninstalled. This prominent placement for SharePlay adds another layer that entrenches Apple's control over iPhone users, further locking them into the iOS ecosystem. Apple leverages technical infrastructure and permissions only it can access to support SharePlay's functionality, including:

a. SharePlay is embedded in FaceTime and Messages, Apple's first-party video-chat and messaging apps, where users can initiate synchronized playback from a text conversation;

b. SharePlay can be activated by Siri voice commands;

c. SharePlay generates system-level lock screen notifications that use notification types unavailable to third-party apps;

d. SharePlay leverages Apple's Continuity system for seamless cross-device handoff between iPhone and Apple TV;

e. SharePlay is available in CarPlay enabling passengers to automatically connect to a driver's co-listening session from their iPhones; and

f. SharePlay is the exclusive co-viewing framework on Apple VisionPro.

86. By forcing SharePlay onto users at each of these interaction points, Apple further entrenches users into the Apple ecosystem, compounds users' cost to switch away from Apple, and creates additional revenue sources for Apple. Apple's chosen interaction points are fundamental to the ways that iPhone users interact with their devices every day and, critically, are architecturally exclusive to the Apple ecosystem. As explained by the DOJ and State Attorneys General in United States v. Apple: "Apple selectively designates APIs as public or private to benefit Apple, limiting the functionality developers can offer to iPhone users even when the same functionality is available in Apple's own apps, or even select third-party apps." The gatekeeping of these mechanisms for exclusive use by Apple's technology—in this instance,

SharePlay—creates an anticompetitive structural moat that no competing co-viewing service can overcome regardless of its technical quality or user base.

87. Even after many years on the market, SharePlay remains inferior to Rave from a technical and user experience perspective. For example, SharePlay does not provide access to public watch rooms and caps the number of participants in a watch room. SharePlay also offers users fewer premium content sources for co-viewing and fewer real-time communication tools. SharePlay does not support Netflix—the world's most popular streaming service and Rave's single most-used premium content source.

88. Because SharePlay is not cross-platform, using the feature requires all participating users to own an Apple device. If a user wants to host SharePlay watch parties with their friends and family on their smartphones, everyone must use iPhones.

89. While limited in technical capabilities that benefit users, SharePlay serves its intended purpose from Apple's perspective: it provides more opportunities to extract even greater monopoly profits from locked-in iPhone users by cross-selling other Apple products and services. Indeed, Apple ensures that SharePlay is the only smartphone co-viewing solution that is compatible with its suite of content services, and encourages users to co-view media from AppleTV ($12.99 per month, or $99.99 annually) and Apple Music ($10.99 per month for individuals), multiplayer gaming from Apple Arcade ($6.99 per user, per month), or workout or meditation sessions in Apple Fitness ($79.99 annually). In addition, SharePlay allows users to access certain apps downloaded from the App Store in a co-viewing session, such as multi-player games, but only if all participating users have the app installed on their iPhone—encouraging users to consume more content and make additional in-app purchases for which Apple may receive up to a 30% revenue share, further increasing Apple's monopoly profits.

90. An iPhone user who is forced to build co-viewing habits around SharePlay—watching movies with friends, following along with workout classes, sharing screens during group calls—accumulates a set of shared experiences and social expectations that function only within iOS and is less likely to ever leave the platform. If that user tries to switch to an Android smartphone, they will face not only the loss of features, but of the social network built around them.

### H. As "Sherlocking" Tactics Expand, Apple Targets Rave with Depreferencing and Manipulates App Store Controls To Slow Rave's Growth

91. Following the launch of SharePlay, Apple began manipulating its App Store controls to suppress Rave's growth and make it more difficult for Rave to acquire iOS users.

92. Between 2021 and 2025, following the launch of SharePlay, Apple manipulated its App Store controls to suppress Rave's growth. Although the Rave app was steadily seeing increased interest from consumers, its monthly first-time App Store downloads—i.e., new user acquisition—conspicuously stalled. During this same period, Rave's conversion rate—the percentage of users who actually downloaded the app after visiting the Rave App Store listing—increased from 14 percent to 34 percent, showing that demand for the Rave app was rising, not falling. But Apple throttled Rave's downloads in the App Store to prevent strong consumer interest from translating into growth.

93. Specifically, through algorithmic throttling, Apple limited Rave's daily App Store downloads, to far below previous levels. This throttling did not address any security, compliance, or quality issue. To the contrary, the throttling served no purpose other than to harm a rival and stifle a competing smartphone co-viewing application. Apple has never offered any explanation for its decision to throttle Rave's App Store downloads.

94. Though Rave continued to provide co-viewing services to iPhone and Android customers without incident, Rave's new user acquisitions plateaued due to Apple's distribution bottleneck.

**I. Apple Pretextually Removes Rave From The App Store**

95. On August 13, 2025, Apple notified Rave via its App Store developer portal, App Store Connect, that its Developer Program account had been flagged for removal due to purported "dishonest or fraudulent activity." Effective immediately, the Rave app was removed from the App Store, and any existing iPhone users who reset their device, deleted the app or for whom iOS automatically offloaded it, or bought a new phone could never reinstall it. Moving forward, Rave could not push software updates to its existing users to patch bugs or to maintain compatibility with newly released updates to Apple's iOS.

96. Rave immediately requested specific details supporting Apple's accusation, a phone call, and the opportunity to address Apple's concerns. Apple responded by providing an electronic appeal form limited to 2,000 characters. For four months, in response to Rave's diligent efforts to address Apple's unspecified concerns, Apple stonewalled and informed Rave that Apple's investigations take time and involve multiple Apple personnel—even as Rave's business was dying in real time.

97. Apple did not remove Rave in response to a specific safety concern. Apple waited until SharePlay had been sufficiently developed to make Rave's elimination strategically useful. Rave was not only SharePlay's greatest competitor; it was SharePlay's only viable competitor, with a large and growing user base, superior features, and most importantly, full cross-platform support on Android and Windows.

98. Unable to stop Rave's growth, and unable to degrade its performance because it did not rely on iOS, Apple simply killed Rave on iOS. Apple refused to identify a specific defect in the Rave app or explain the findings of its four-month "investigation."

99. The abrupt termination of Rave fits Apple's pattern of pretextual removal. Over four months, Apple repeatedly shifted its justification for removing Rave's app from the App Store, straining—and failing—to demonstrate a concern with the app.

100. Apple's refusal to provide Rave with details on the alleged violation demonstrates that Apple's accusations were meritless. Rave had been a compliant developer on the App Store for more than a decade and remained compliant through its removal. Just six months before receiving Apple's termination notice, Apple had conducted a review of the Rave app and confirmed compliance with Apple's policies. Moreover, the Rave app is also available on Android via the Google Play Store, where it is independently subjected to Google's safety review. Google Play has never terminated Rave's developer account or accused Rave of "fraud."

101. After removing the Rave app from the App Store, Apple spent months purportedly "investigating" the app and working to manufacture a pretextual justification for the removal. Meanwhile, Apple allowed verifiably dangerous and abusive apps to flourish on the App Store where, unlike Rave, those apps were more profitable to Apple and contributed directly to Apple's monopoly profits.

102. For example, some of Apple's most profitable developer partners, including Roblox, BIGO Live, and Telegram (whose CEO was arrested in 2024 for managing a platform facilitating illegal activities), are widely and publicly known for their failures in basic safety controls, content moderation, and deceptive or abusive practices. For example, multiple State Attorneys General and plaintiffs in more than 130 private cases have sued Roblox for facilitating unlawful acts, failing to implement basic safety controls, and deceiving parents about the safety

of its platform. Along with Roblox, BIGO Live, a popular streaming service that allows users to tip creators with digital "gifts" redeemable for real-world currency, is under investigation for child exploitation.

103. Apple continues to host, promote, and profit from these harmful apps on the App Store. By conservative estimates, Apple earns hundreds of millions of dollars annually in commissions from these applications with extensively documented safety problems. Apple's safety standards are not neutral or uniformly applied, but tools Apple uses, without regard for safety, to target developers that threaten its dominance or its profits and protect developers that generate substantial revenues for Apple.

104. Apple's pretextual removal of the Rave app under the guise of "safety" has, in reality, made iOS users less safe. Fraudulent impersonator apps now appear as the top search results for "Rave" on the App Store, exposing millions of former users of the Rave app to scam applications that take advantage of the trust and brand recognition that Rave built over a decade.

105. For example, shortly after the Rave app's termination, bad actors attempted to capitalize on the Rave app's reputation and dedicated user base by publishing fraudulent "Rave" listings on the App Store, which Apple approved for distribution.

106. Since the Rave app was removed by Apple on August 13, 2025, multiple imposter apps have launched on the App Store, featuring "RAVE" prominently in the app listing or app name, or adopting iconography designed to impersonate Rave's branding. While these app listings market purported features of the Rave app, low ratings and accompanying user reviews indicate these apps do not function as advertised. Unlike Rave, some of these apps offer in-app purchases. Given the transparent attempts to confuse users by misappropriating the Rave brand and misrepresenting their capabilities, these imposter apps appear to have been approved by Apple without meaningful review. While Apple spends billions on marketing to promote itself as

a champion for consumer privacy and security. Apple selectively compromises those values when doing so serves its financial interest.

### J. Apple Terminates Rave's Developer Credentials, Cuts Off Alternative Distribution Channels, And Calls The Rave App "Malware"

107. To perfect its scorched-earth campaign against Rave, on December 19, 2025, Apple terminated Rave's developer account. By this point, the Rave app had not been listed in the App Store for four months, during which time Rave could not acquire new iOS users, or update versions of the app for its existing installed base.

108. Upon termination of Rave's developer account, push notifications to Rave's existing iOS-installed user base ceased within minutes. Users were not informed but simply stopped receiving notifications from the Rave app, including notices about friend activity, room invitations, and direct messages. From the user's perspective, the app simply stopped working. Users were confused and, in response, abandoned the app.

109. By April 2026 (the most recent full month of data available), Rave lost 91.2% of its July 2025 iOS users. Only 1.1% of these lost users switched to Rave's offering on a different platform. Instead, following Rave's removal from the App Store, Apple's actions forced users to either divert to the only remaining viable smartphone co-viewing competitor—SharePlay, despite its inferior capabilities—or stop co-viewing on their smartphones altogether.

110. Apple's termination of Rave's developer credentials also foreclosed any ability Rave would have to access any of its global iOS user base through alternative distribution channels. For example, in the European Union, the Digital Markets Act requires Apple to allow third-party app stores to distribute apps for iOS, provided its developers submit their apps to an automated security screen in a process called Notarization. Rave's Notarization submission sat in "Waiting for Review" for thirty-six days. When Apple terminated Rave's developer credentials,

it no longer recognized Rave as a developer—automatically cancelling its ability to seek Notarization.

111. Apple also invalidated Sign In With Apple ("SIWA") credentials for millions of Rave users worldwide, locking 11.4 million users out of their Rave accounts. SIWA is a unified authentication system, i.e., a single sign-on tool that minimizes user burden of remembering individual logins for different apps and websites. Apple requires that all developers integrate SIWA as a prerequisite to App Store listing if the developer allows *any* third-party sign-in option (for example, Sign in with Google).

112. SIWA can be used as a sign-in tool for any user, not just a user on an Apple device. Consequently, Apple's decision to invalidate SIWA credentials affected Rave's users globally across all platforms. To make matters worse, because SIWA uses Apple's private email relay system, Rave has no way to identify which users were affected, contact those users, or reset users' credentials. Users who created Rave accounts using SIWA—including users on Android and Windows—are permanently locked out of their accounts, friend lists, watch histories, and chat logs. Having compelled Rave to build this SIWA dependency into the app, Apple then weaponized it to destroy Rave's user relationships on iOS products and beyond.

113. At the same time, Apple revoked Rave's Developer ID certificates, branding Rave as malware and triggering a kill switch on up to 7.5 million macOS installations. Specifically, Apple configured macOS to block the Rave app and present a system-level warning falsely stating "⚠️ Malware Blocked and Moved to Trash - 'Rave.app' was not opened because it contains malware. This action did not harm your Mac." These statements are false: Rave does not contain any malicious code, security vulnerability, or technical deficiency that would support a classification as malware. Apple had never made malware allegations about Rave in the more

than ten years since the Rave app was first published on the App Store prior to communicating these warnings directly to Rave's users.

114. By falsely labeling Rave "malware," Apple told as many as 7.5 million Mac users that software they had trusted with their social and streaming account service login credentials, that they may have used as much as 1.5 hours daily, and that they and their friends and family had installed on their devices, was a security threat. By April 2026, Mac monthly active users had collapsed more than 95%. The practical and intended effect of these statements was to induce users to uninstall Rave and turn to SharePlay.

115. Apple never communicated with Rave about the Mac application in any way before labeling it "malware." Apple could have used neutral and accurate language to convey the error, such as "Developer certificate revoked." It chose not to.

116. Apple's exclusionary conduct against Rave is consistent with its longstanding and well-documented anticompetitive strategy of "Sherlocking." The final step in that strategy: destroy the competition.

## RELEVANT MARKETS

### A. Smartphones

117. Smartphones are a relevant antitrust market.

118. Smartphones are mobile telephones that incorporate a display screen and an operating system that allow for the installation of software applications. Smartphones also typically incorporate hardware such as cameras for recording and transmitting photos and videos, and technology for accessing Wi-Fi.

119. "Feature phones" are not reasonable substitutes for smartphones. Unlike smartphones, "feature phones" have basic operating systems and more limited capabilities, including limited support for third-party software and mobile apps. Feature phones allow for

calling, messaging, and may have only basic versions of calendar, email and web browsers as compared to smartphones. In contrast, smartphones are equipped with more advanced versions of these tools that are integrated with a smartphone's operating system (or supplied via mobile apps), allowing for features that are unavailable on feature phones, such as push notifications. Smartphones are substantially more expensive than feature phones.

120. Other portable devices, such as laptops and other computing devices (e.g., tablets and smart watches) are not reasonable substitutes for smartphones. Smartphones are designed to be usable with one hand and can typically fit in a person's pocket, unlike tablets and laptops. And unlike tablets and laptops, smartphone hardware emulates traditional phones—with a receiver and speaker corresponding to where a user's ear and mouth are—making smartphones better suited for phone calls, particularly when the smartphone user is on the go. Smartwatches have smaller displays than smartphones, making smartwatches unsuitable for many smartphone use cases (e.g., watching a movie via a streaming platform is not feasible on a smartwatch). Apple's own smartwatches are designed to be used with an iPhone and offer specific features that cannot be used without a customer using both the Apple Watch and the iPhone.

121. Apple, other participants in the market, industry sources, and the public at large recognize that smartphones are distinct from feature phones and other portable devices. Apple and Samsung, for example, market "smartphones" on their websites. Competition from feature phones or other portable devices are not sufficient to prevent Apple from exercising monopoly power in the smartphone market.

122. Given the feature and price differences, a hypothetical monopolist of smartphones could implement a small but significant non-transitory increase in smartphone prices without smartphone customers switching to feature phones or other portable digital devices to discipline such a price increase.

123. The relevant geographic market for smartphones is the United States.

124. U.S. smartphone customers often purchase smartphones together with a mobile phone plan. In such cases, the carrier helps the customer set up the device for use on a carrier's U.S. cellular network.

125. Smartphones made for regions outside the U.S. use different components designed for use with different cellular technologies than those used in the United States. Mobile networks outside the U.S. can use different cellular bands than are used within the United States. The difference in cellular technologies in the U.S. and the country of purchase can limit the functionality of smartphones purchased abroad or even render them unusable in the United States.

126. Additionally, U.S. mobile carriers often provide promotions where the device and phone plan are discounted when purchased together. Any customer who would purchase a smartphone outside of the United States would lose access to these benefits. Because smartphone warranties are typically restricted to the country of purchase, a U.S. customer choosing to purchase a smartphone abroad would do so at the risk of manufacturing or other defects.

127. U.S. regulations—including the Federal Communications Commission and trade regulations—also constrain the sale of non-U.S. smartphones within the United States.

128. Because U.S. customers cannot reasonably substitute their devices with non-U.S. smartphones, the relevant geographic market for smartphones is the United States.

**B. Performance Smartphones**

129. While all smartphones compete against each other in a broad relevant market, Apple and other industry participants assess competition among smartphones in narrower submarkets of the larger all-smartphone market. Apple chooses to compete exclusively in the "performance" smartphone submarket of the broader all-smartphones market.

130. Performance smartphones are a narrower relevant product market within the broader market of all smartphones. The market for performance smartphones includes iPhones and devices that compete with most iPhones, which are sometimes considered "premium" or "flagship" devices. The relevant market for performance smartphones excludes sales of lower-end or "entry-level" smartphones.

131. Apple, other device manufacturers, and consumers recognize that high-end, performance smartphones such as iPhones are distinct from lower-end, entry-level smartphones. Apple's internal documents indicate Apple does not view entry-level smartphones as competing with iPhones or other performance smartphones. Apples chooses not to compete for sales of lower-end, "entry-level" smartphones. Accordingly, the most relevant market to assess Apple's conduct is a narrower submarket that consists of performance smartphone devices and excludes entry-level devices. Regardless of how the market is drawn, Apple's conduct is unlawful.

132. Performance smartphones have distinct characteristics from entry-level smartphones. Because of these distinctions, entry-level smartphones cannot support the same features or uses as performance smartphones.

133. Performance smartphones are made with durable, high-quality materials such as metal and glass, and contain sophisticated components to support better visual displays, faster performance, and running more intensive software applications, such as cloud gaming or content streaming that generally consumes more data and battery power and require greater on-device storage.

134. Entry-level smartphones are made with lower-quality, less durable materials and contain less sophisticated components such as slower processing chips, lower-capacity storage, lower-resolution displays, and less battery life. Because entry-level smartphones include less advanced technical components, the software applications that can run on these devices are

generally less complex. Additionally, large data-dependent processes (such as streaming content, cloud gaming applications, or programs that require significant storage capacity) may not be suitable for entry-level smartphones. Entry-level smartphones are generally less expensive to produce.

135. Because of these and other differences between performance smartphones and entry-level smartphones, smartphone manufacturers, retailers, carriers, and consumers recognize that entry-level smartphones are not reasonable substitutes for performance smartphones.

136. Consumers purchase performance smartphones under different terms than entry-level smartphones. Whereas entry-level smartphones are often sold along with a pre-paid service plan, consumers generally purchase performance smartphones for use with post-paid service plans.

137. Competition from entry-level smartphones is not sufficient to prevent Apple from exercising monopoly power in the performance smartphone market.

138. Given the feature and price differences, a hypothetical monopolist of performance smartphones could implement a small but significant non-transitory increase in performance smartphone prices without customers switching to entry-level smartphones, feature phones, or other portable digital devices to discipline such a price increase.

139. Because the market for performance smartphones is a narrower submarket of the relevant market for smartphones, the characteristics of the relevant geographic market for smartphones as discussed above apply with equal force to the relevant geographic market for performance smartphones. As such, the relevant geographic market for performance smartphones is the United States.

### C. Smartphone Co-Viewing Applications

140. Smartphone co-viewing apps are a relevant antitrust market.

141. Smartphone co-viewing apps are software applications that allow users in separate locations to experience and discuss audiovisual content together in real time from their smartphone. Industry participants, developers, and consumers recognize smartphone co-viewing apps as a distinct category of software because consumers seek smartphone co-viewing apps for a specific purpose.

142. Products in the smartphone co-viewing app market combine: (1) the ability to stream synchronized audio and/or video content from third-party platforms to participating users on users' individual smartphones, with (2) real-time communication features (e.g., text, voice, or videochat) embedded within the synchronized playback environment.

143. Users seeking smartphone co-viewing experiences specifically search for and compare smartphone co-viewing apps rather than desktop or browser co-viewing. Many of these users rely on a smartphone as their primary or only computing device. Smartphones are private, accessible, and serve as the primary way for these users to communicate and consume media. Smartphones are designed to be usable with one hand and can typically fit in a person's pocket, unlike tablets, laptops, and personal computers. Co-viewing on larger, non-smartphone devices, including desktops, laptops, tablets, or within web browsers, are not reasonable substitutes for smartphone co-viewing apps because they require users to be seated at a specific fixed location with space to accommodate a larger device. These experiences lack the portability, spontaneity, and convenience that defines the smartphone co-viewing experience. These differences are not marginal but go to the core of how and why consumers use smartphone co-viewing apps.

144. Consumers deprived of access to a smartphone co-viewing app do not substitute with other forms of co-viewing because the co-viewing experiences are not reasonably interchangeable. Indeed, since Apple removed the Rave app from the App Store, the vast majority of smartphone co-viewing users on the Rave app have not shifted their consumption to

co-viewing on a different device. Less than 1% of the over 90% of lost iOS users switched to Rave's desktop viewing platform. Apple's actions forced Rave users to either accept a degraded experience and resort to using SharePlay or cease having a smartphone co-viewing experience with their friends.

145. App Store listings, product reviews, and consumer usage trends demonstrate that users seeking smartphone co-viewing experiences specifically search for and compare smartphone co-viewing apps and do not consider other software categories, such as streaming services, social media, or messenger apps to be reasonable substitutes for smartphone co-viewing.

146. No combination of streaming services, social media, or messaging apps can replicate the real-time synchronized social experience of smartphone co-viewing. Manual attempts to replicate synchronized playback across users, shared session control, and integrated real-time social interaction on mobile devices—such as screen-share based solutions—are not technically feasible or provide a low-quality experience and are substantially inferior to a true smartphone co-viewing experience. Further, these workarounds may implicate content piracy concerns. Accordingly, these other app types are not reasonably interchangeable with products in the smartphone co-viewing app market.

147. Competition from desktop, browser, other non-smartphone co-viewing, or from other software categories is not sufficient to prevent Apple from exercising monopoly power in the smartphone co-viewing app market.

148. A hypothetical monopolist of smartphone co-viewing apps could safely reduce quality, for example by reducing functionality or limiting available streamable content, without consumers turning to a non-smartphone co-viewing experience or another category of software.

149. The relevant geographic market for smartphone co-viewing apps is the United States.

150. U.S. consumers obtain smartphone co-viewing apps through digital distribution channels that serve the domestic market, such as Apple's App Store and Google's Play Store. Both Apple and Google maintain geographically segmented storefronts for each country in which they operate, which display country-specific pricing, editorial curation, ratings, and other geographic-specific information. U.S. consumers look to these domestic distribution channels—the U.S. App Store and U.S. Google Play Store—for smartphone co-viewing applications. If an application is removed from a domestic distribution channel, U.S. consumers generally cannot obtain it from a foreign storefront.

151. Additionally, the value of a smartphone co-viewing app to a U.S. consumer depends on its integration with the U.S. content libraries of streaming services. This content layer distinguishes the U.S. smartphone co-viewing app market from smartphone co-viewing app markets abroad.

152. Within the United States, competitive conditions for smartphone co-viewing applications are substantially uniform. Consumers nationwide access these products through the same app-distribution infrastructure, are governed by identical platform policies governing app availability and functionality, and operate within the same ecosystem of smartphones, streaming services, payment systems, and communications networks. Apple administers these conditions through its centralized control of the App Store, including unilateral authority over app approval, removal, and developer account access.

153. A hypothetical monopolist of smartphone co-viewing apps in the U.S. could safely reduce the quality of their app without consumers turning to smartphone co-viewing apps offered in other countries.

# MONOPOLY POWER

## A. Apple Has Monopoly Power In the Market for Smartphones

154. Apple is the dominant provider of smartphones in the United States.

155. Apple's U.S. market share has steadily increased over the past decade. In 2025, Apple's share of smartphones in the United States was at least 65 percent, reaching a high of 69 percent in Q4 2025.

156. Apple's dominant position in the smartphone market is protected by multiple barriers to entry that inhibit the entrance of new competitors and discourage customers from switching from iPhones to other smartphones. For example, designing and manufacturing smartphone hardware requires billions of dollars in capital, advanced supply chain control, and substantial manufacturing scale—particularly for performance smartphones, which have highly specialized components like displays, sensors, and advanced chips that are sourced years in advance by existing manufacturers. Other significant barriers to entry with respect to hardware include product design, software development, regulatory approval, manufacturing, marketing, and customer service. Moreover, because smartphones are frequently bought through wireless carriers, new entrants must meet a carrier's technical requirements to access the major networks in the United States. New entrants and smaller rivals must also negotiate distribution agreements and persuade wireless carriers and other retailers to promote their products to consumers.

157. Rival smartphone manufacturers must also overcome the substantial network effects generated by interactions between users, developers, and others who interact with the iPhone. Apple recognizes and exploits these barriers to entry to protect itself from competition from rival platforms and innovations, products, and services that may diminish consumer reliance on the iPhone. iPhones, for example, have functionalities that are severely limited or unavailable unless the iPhone user communicates with another iPhone user. For example, SMS

messages sent from iPhones to non-iPhones are displayed in lower-contrast, green bubbles (rather than blue, which are harder for users to read and creates stigma for non-iPhone users), are not encrypted, and transmit videos at lower resolutions. Features like Apple's FaceTime can be initiated only by an iPhone user and can be used by non-iPhone users only if the iPhone user provides a link (as opposed to being able to join a call by swiping or pressing a button). And, as noted, Apple's SharePlay can launch co-viewing sessions between users on iOS and does not support smartphone co-viewing between iOS and Android users. Given the iPhone's dominance, non-iPhone users are encouraged to switch to iPhones to reduce friction when communicating with others (who mostly use iPhones) and discouraged to switch to rivals.

158. There are also significant network effects due to the incentives of mobile app developers. App developers must configure their apps to work with the operating system of the smartphone manufacturer. A new phone manufacturer that wants to provide an innovative operating system in its smartphone—e.g., something besides the incumbent iOS and Android operating systems—faces significant challenges to attract app developers to make apps for that operating system. The smartphone must attract enough users so that app developers make apps for the operating system, but to attract users, a smartphone needs to offer a robust catalog of mobile apps. This chicken-or-egg problem provides a significant hurdle to potential new smartphone entrants.

159. Since fewer than ten percent of smartphone purchasers in the United States are buying their first smartphone, there are fewer new customers available for Apple's rivals. Instead, rivals must encourage existing iPhone users to switch away from using an iPhone to using another smartphone when they replace or upgrade their phone. These switching costs help lock in Apple's position as the dominant incumbent, including the costs associated with learning how to use a new operating system and user interface, transferring all the relevant data (e.g.,

phone contacts, email addresses, photos) and apps between devices, changing the management of subscriptions, and replacing any incompatible companion or accessory products. As a result, switching costs—many deliberately created or exacerbated by Apple—impose increasingly impenetrable barriers to entry and expansion for rival smartphones.

160. Indeed, Apple has been so successful at maintaining and increasing these sources of friction that iPhone users continue to use the iPhone despite increases in price and reductions in quality. Most Americans—91 percent—already own a smartphone, meaning most smartphone purchases are to replace an existing smartphone. And almost all iPhone customers—89 percent—replace their iPhone with another iPhone.

161. These barriers to switching that keep iPhone customers using iPhones have prevented well-capitalized technology companies from successfully entering the market. There are multiple examples of companies that attempted to enter the U.S. smartphone market but failed due to the significant barriers to entry and high customer switching costs. Prominent examples include Amazon (which exited in 2015), Microsoft (which exited in 2017), and LG (which exited in 2021).

162. Apple's monopoly power is also demonstrated by its ability to earn consistent monopoly profits. Apple's net income has been positive since at least 2009 and reached over $93 billion in 2024, driven largely by iPhone sales. In January 2025, Apple CEO Tim Cook boasted that "Apple is reporting our best quarter ever," marked by record-high earnings per share. Apple further monetizes this monopoly power by charging its captive audience of iPhone users for related services, apps, and features (such as Apple TV, Apple Music, Apple Fitness, and Apple Arcade), and by monetizing successful third-party developers' innovations through its App Store commission model.

163. Apple has exhibited direct evidence of monopoly power through its ability to control prices and exclude competitors. Apple has been able to consistently raise the prices of its iPhones. In 2020, Apple raised the price of an iPhone by nearly 20 percent, indicating that Apple is not constrained by smartphone rivals in setting its prices. Today, Apple charges as much as $1,599 for an iPhone and earns high margins on each sold. In fact, Apple's margins are twice that of competing smartphone manufacturers.

164. On the iPhone device hardware alone, total sales of which account for half of Apple's annual revenue, Morgan Stanley estimates Apple's profit margins at 30 to 35 percent. Beyond this, Apple pads its monopoly profits by extracting up to 30 percent of every sale made by app developers and third-party services within the Apple ecosystem. For example, Apple rakes in fees from purchases through Apple Pay, internet searches, and downstream features that its captive users utilize, as well as sales of the host of Apple products and services tied to the iPhone ecosystem like AirPods, AirTags, Apple Watch, Apple Care, Apple TV, Apple Music, Apple Fitness, and Apple Arcade.

165. Apple's monopoly power is also evident from its ability to impede threats from cross-platform, multi-function apps such as Rave that threaten to erode users' high switching costs. Apple's control of the App Store and the intentional lack of interoperability with other smartphones allows it to protect itself from competitive challenges from developers who would disrupt the "sticky" nature of the iPhone.

166. This direct evidence of Apple's monopoly power is further supported by statements from Apple's executives that acknowledge that Apple can safely forgo innovation without fear of losing customers. For example, an Apple Vice President of Marketing stated that Apple "need[s] to set a stake in the ground for what features we think are 'good enough' for the

consumer," and that moving forward, "anything new and especially expensive needs to be rigorously challenged before it's allowed into the consumer phone."

### B. Apple Has Monopoly Power In the Market for Performance Smartphones

167. Apple is the dominant provider of performance smartphones in the United States.

168. As discussed above, performance smartphones, which include Apple's iPhone, constitute a distinct, narrower relevant market within the broader all-smartphones market in which Apple holds over 70 percent market share in the United States.

169. Apple's dominant position in the performance smartphone market is protected by multiple barriers to entry that inhibit the entrance of new competitors and discourage customers from switching from iPhones to other performance smartphones.

170. Performance smartphones, like all smartphones, are multi-sided platforms that exhibit significant network effects among both users and app developers. As discussed above, because of Apple's dominance: existing iPhone users are discouraged from switching from iPhones due to technical and social challenges; non-iPhone users are encouraged to switch to iPhones to reduce friction when communicating with others (who mostly use iPhones); and mobile app developers are incentivized to build apps for iPhones where the app will be available to the greatest number of performance smartphone users, which in turn entices more customers to use an iPhone over a competitor's performance smartphone.

171. The performance smartphone market is marked by the same high switching costs that discourage customers from switching away from the iPhone as the broader all-smartphones market. iPhone customers who consider switching to a competitor's performance smartphone do not just surrender their iPhone, but every aspect of the Apple ecosystem that comes with it, including familiarity with their existing iOS operating system; any data, apps, or content that

cannot be transferred but must be repurchased on a new performance smartphone; and replacing any incompatible companion or accessory products.

172. The high costs of switching from the iPhone preserves Apple's dominant position in the performance smartphone market, and with that dominance, Apple's ability to earn consistent monopoly profits; enables Apple's ability to profitably raise prices; keeps iPhone customers using iPhones; prevents competitors from successfully entering the performance smartphone market; and impedes the development of cross-platform apps that threaten Apple's dominance or weaken the iPhone's high switching costs.

### C. Apple Has Monopoly Power In The Market for Smartphone Co-Viewing Apps

173. Apple is the dominant provider of smartphone co-viewing apps in the United States with its product SharePlay.

174. Apple's SharePlay for smartphone co-viewing comes preinstalled on every iPhone. As discussed above, the iPhone holds a dominant position in the markets for smartphones and performance smartphones in the United States, accounting for 65 to 70 percent market share in 2025 and growing. Apple's removal of Rave from the App Store eliminated the only viable co-viewing competitor to Apple's SharePlay on the iPhone, as the remaining third-party options lack the requisite co-viewing features and have limited adoption among iPhone users. Consequently, SharePlay has around 65 to 70 percent market share (or more) in smartphone co-viewing as a function of Apple's dominant iPhone share.

175. Apple's monopoly power in smartphone co-viewing is protected by significant barriers to entry. For example, SharePlay comes preinstalled on iPhones where it is built into fundamental iPhone functions like Messages and FaceTime, as well as compatible with Apple accessory devices and services such as HomePod and CarPlay. Apple's dominant position also means that SharePlay can access priority APIs and other capabilities that are unavailable to third-

party apps. While a third-party developer must rely on users discovering and downloading its app from a distribution channel (the App Store), Apple skips this step and puts SharePlay directly into the hands of every user, built into features these users already know and understand.

176. A third-party developer of a co-viewing app also faces high investment costs as a barrier to entry and expansion. Smartphone co-viewing apps require solving formidable engineering challenges, including: real-time synchronization across geographically distributed users, low-latency networking, seamless audio and video integration, and coordination with multiple streaming services' digital-rights-management and content-protection protocols.

177. The lack of a substantial user network is also a barrier that a competing third-party developer must overcome. Smartphone co-viewing apps facilitate social experiences and consequently exhibit significant network effects—the acquisition of new users depends on the presence of existing users. Smartphone co-viewing apps grow in popularity as users encourage their social networks, friends, and family to engage in shared co-viewing sessions. By the same token, a sudden loss of users can lead to a domino effect. In the case of the Rave app, Apple's actions to destroy the population of iOS users on the Rave app degraded the entire cross-platform network. As more users turn to SharePlay as their default smartphone co-viewing solution, these network effects compound—iPhone users accustomed to SharePlay encourage other iPhone users to use SharePlay, reinforcing this dependency—and make it progressively more difficult for any rival to attract a user base and compete. Apple's preinstallation of SharePlay on every iPhone gives Apple immediate scale advantages that no rival can replicate.

178. Similarly, a would-be rival developer in smartphone co-viewing faces barriers to entry compared to incumbents like Apple because of significant indirect network effects between users and content providers. For a would-be rival to attract users to its smartphone co-viewing app, it needs to offer enough integrated media sources (e.g., streaming service integrations,

music catalogs, etc.) for users to co-view. And, in turn, persuading media content providers to agree to integrate with an app requires demonstrating that enough users will be present in the app and will subscribe to these providers' streaming platforms.

179. Even if a third-party developer were to overcome these challenges to compete with SharePlay, Apple could simply weaponize its control of the App Store again to neutralize any competitive threat and ensure SharePlay's continued dominance in the smartphone co-viewing market. Indeed, as recognized by the 2020 Congressional Report, Apple routinely develops and distributes apps that directly compete against third-party developers. The 2020 Congressional Report concludes that this dynamic, coupled with Apple's gatekeeper power over the App Store as the exclusive distribution channel for iOS apps, "has the potential to distort competition, lead to discrimination and higher entry barriers for third-party developers, and result in . . . self-preferencing" behaviors that harm consumers and competition.

180. In all, there are estimated to be between approximately 125 million to 150 million active iPhone users in the United States as of early 2026; Apple pre-installed SharePlay on each and every one of these devices. Apple's monopoly power in the smartphone co-viewing market does not arise from the superiority of Apple's co-viewing product. Instead, it flows directly from Apple's monopoly control over the App Store and its unilateral ability to preinstall its own first-party co-viewing feature onto every iPhone.

181. By eliminating Rave from the App Store, Apple removed SharePlay's only viable competitor for smartphone co-viewing for at least 65 to 70 percent of U.S. smartphone users. As indicated above, the absence of Rave has created a vacuum largely occupied by illegitimate, scam apps without true co-viewing capabilities—many of which have co-opted Rave's name and brand to entice user downloads, without offering equivalent features or content. To the extent any legitimate co-viewing apps remain available on the App Store, they do not impose a

meaningful competitive constraint on Apple's SharePlay monopoly because they lack a significant installed base as reflected by fewer than 5,000 ratings (in some instances, only a few dozen or no ratings), are unpopular (reviews under 4-stars; significant negative reviews), or do not offer the requisite co-viewing features and content options. These other apps either have poor synchronous video technology or have fewer streaming options (e.g., limited to YouTube, screenshare, or local files). Unlike Rave, they also do not have text message and voice capabilities to converse while the stream is ongoing, nor do they have public rooms for people to be invited to or to join freely.

182. Apple has demonstrated monopoly power directly by its ability to exclude competitors and reduce quality without any competitive consequences. Most significantly, Apple was able to profitably exclude the Rave app and force users to use an inferior smartphone co-viewing product (SharePlay) without losing customers, demonstrating that Apple is not constrained by the ordinary forces of a competitive market. Whereas in a competitive market, SharePlay's product deficiencies (e.g., lack of cross-platform functionality and interoperability, lack of Netflix support) would cost Apple customers, Apple's elimination of Rave from the App Store has not resulted in any competitive consequences for Apple. Instead, Apple has been able to reinforce its "walled garden" by eliminating a cross-platform super app.

## HARM TO COMPETITION

183. Apple's conduct has harmed competition by eliminating the most significant cross-platform alternative to SharePlay, reinforcing the iOS ecosystem's closed architecture, and increasing the switching costs that maintain Apple's smartphone monopoly and allow it to generate supracompetitive profits.

184. Apple exploits its platform controls to limit the development of technologies that function on or with iPhones by gatekeeping technical requirements, such as developer program

credentials and APIs that are, necessary to design and build features compatible with the iPhone's iOS operating system. Even where a developer creates a functional iOS app without Apple's APIs, Apple can preclude these innovations from reaching iPhone consumers by controlling the only available distribution channel, the App Store. The greater Apple's dominance in smartphones, the greater the share of the market Apple controls and the greater Apple's ability to foreclose developers seeking to reach iOS users to provide innovative apps and services.

185. Apps that are allowed in the App Store are still subject to Apple's control: Apple manipulates controls in the App Store to limit an app's visibility and prevent these technologies from gaining users at scale, or in some cases, to remove competitive threats outright. As a result of Apple's restraints, smartphone users are left with a decreased ability to switch from iPhones, fewer and worse choices in smartphones, higher prices for iPhones, fewer and lower quality apps and features on iPhones, and less innovation from Apple and others. Meanwhile, smartphone developers are limited in their ability to attract a critical mass of users to sustain the developers' businesses and invest in further innovation that benefits users. Left unchallenged, Apple will continue to prevent disruptive companies from developing technologies that lower user switching costs, improve smartphone user experiences across smartphone operating systems, and thereby threaten Apple's smartphone monopoly or the monopoly profits it yields.

186. Apple protects its monopoly power by increasing technical, behavioral, monetary, and other costs of switching from an iPhone to another smartphone. For example, Apple uses its control over its App Store developer tools and distribution channel to impede the development or prevent user access to cross-platform apps like Rave that reduce users' dependence on Apple and the iPhone. If consumers have meaningful choices besides the iPhone, Apple risks losing its substantial profits on sales of the iPhone itself in addition to sales in other product areas that

Apple has integrated into the iPhone platform. For example, Apple's substantial App Store commissions, sales of iOS accessory and companion devices, and various Apple service products are also tied to the success of the iPhone and would be threatened if users switched to a competing smartphone device.

187. Apple's conduct results in less choice and lower quality for smartphone co-viewing apps. In the relevant U.S. market for smartphone co-viewing apps, Apple's SharePlay has only one viable competitor: Rave. As a consequence of Apple's conduct, iPhone users can no longer access Rave and have no meaningful substitute for smartphone co-viewing apps other than SharePlay. Moreover, the Rave app has significantly better features than SharePlay, including cross-platform functionality, more premium content sources for co-viewing, and superior real-time communication tools. Because of Apple's anticompetitive conduct, iPhone users no longer have access to those features.

188. Apple's conduct has made its and competitors' products worse. Apple sacrifices short-term profits Apple could earn from designing new products and features itself, or allowing third-parties to make these innovations available on iOS, in favor of maintaining its monopoly. In a competitive market, Apple would compete aggressively to support the development of apps and accessories that would make iPhones more attractive to users. Instead, Apple suppresses new technologies even when they are popular. In particular, Apple takes aim at cross-platform apps and services because of the threat they pose to Apple's smartphone monopoly. As a result, several developers, Rave among them, have been precluded from developing cross-platform technologies even after making substantial investments in bringing them to market. For example, Rave was working on several new features in its iPhone app when Apple revoked its developer credentials and access to its internal test builds. Developers have also been discouraged from

implementing certain features or improvements into their apps on other smartphones where such features would be prohibited by Apple.

189. Apple's internal documents and testimony of current and former employees demonstrate that Apple is motivated by the anticompetitive purpose of building and maintaining monopoly power in the relevant markets and, in particular, leveraging its smartphone and performance smartphone monopolies to gain an advantage in related markets. Apple sacrifices substantial revenues it could earn from innovative apps and third-party apps and accessories to protect its monopoly. Popular apps would offer iPhone users paid services that generate significant revenue for Apple through subscriptions and in-app purchases. For example, Apple terminated Rave before Rave launched a premium subscription tier that Apple would have profited from. Even before Apple removed the Rave app from the App Store, Apple interfered with the app's user acquisition by suppressing its App Store downloads even though Apple would have earned more commission on Rave's subscription revenue if more iPhone users downloaded and used Rave's iOS app.

190. Apple's unilateral control over iPhone app distribution via the App Store amplifies the harms to competition. If iPhone users could access apps through alternative channels, users could access cross-platform apps without Apple's interference. Apple does not permit developers to distribute their iOS apps outside the App Store, nor does it allow users to choose to get their iOS apps from a source other than the App Store, because if users could gain access to cross-platform apps, it would reduce switching costs and lessen their reliance on Apple.

191. Apple continues to stifle or eliminate competition from cross-platform developers to lock users into Apple devices. As such, Apple has not only harmed current and former users and competitors, but also poses significant risks to future innovation.

192. With respect to Rave specifically, Apple's exclusionary conduct hindered its ability to compete with Apple's SharePlay in the market for smartphone co-viewing apps and has caused concrete, quantifiable harm to Rave's business. Prior to Apple's unlawful, termination of Rave's developer account, company revenue was growing 32% year-over-year and it was just months from launching a premium subscription tier projected to triple its annual income. Apple's conduct has caused significant harm to Rave's enterprise value. In April 2026, eight months after Apple removed the Rave app from the App Store, monthly active users of the iOS Rave app were down more than 83 percent. Active user numbers on MacOS have fallen more than 95 percent since Apple falsely told users that the Rave app contained malware. Android users who can no longer co-view with their iOS peers are also abandoning the platform, with active users down more than 31 percent in April 2026 (as compared to July 2025). In addition, Rave's ability to innovate is frozen to maintain compatibility with earlier-downloaded versions of the Rave app on iPhone. Rave's iPhone users that remain cannot receive push notifications, and an iPhone user is permanently lost each time a user offloads the app, resets their device, or buys a new iPhone. As a result of Apple's conduct, Rave has incurred hundreds of millions of dollars in damages.

## CAUSES OF ACTION

### *First Claim For Relief: Monopolization of the Market for Smartphones in Violation of Section 2 of the Sherman Act*

193. Plaintiff Rave repeats and realleges all preceding paragraphs as though fully set forth herein.

194. Section 2 of the Sherman Act makes it unlawful to "monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2.

195. Smartphones in the United States is a relevant antitrust market and Apple has monopoly power in that market.

196. Apple possesses monopoly power in the U.S. smartphone market, with control of at least 65 percent of U.S. smartphone unit sales. Apple's monopoly power is protected by extraordinarily high barriers to entry—including the costs of operating system development, application ecosystem network effects, substantial consumer switching costs, and hardware supply chain requirements—and reinforced by Apple's vertically integrated control over iOS hardware, software, and app distribution.

197. Despite dramatic shifts in technology, Apple's capacity to dictate the terms of app creation and distribution has remained effectively unchecked by competitive forces. Apple wields its contractual terms with developers to (1) deter developers building technologies that could diminish Apple's dominance, and (2) restrict developers' ability to distribute iOS apps through any channel other than the App Store over which Apple exercises full control.

198. Apple channels iPhone users away from rival products and services, elevating the cost of migrating to a competing device while capturing outsized profits through proprietary subscriptions, App Store advertising, and hardware accessories.

199. Apple's conduct does not reflect competition on the merits. Apple did not displace Rave by building a better product. Apple's anticompetitive "Sherlocking" practices perpetuate the ecosystem lock-in that insulates it from competitive pressures, and foreclose innovation that would otherwise intensify smartphone competition, lower prices, and increase quality and consumer choice.

200. Compared to the but-for world absent Apple's anticompetitive conduct, customers have less choice and smartphones have lower quality and higher prices, lowering marketwide output.

201. There is no legitimate business justification for Apple's exclusionary and anticompetitive conduct. There were substantially less restrictive alternatives available to

Apple—including targeted permission limitations, conditional approvals, technical audits, sandboxing, and monitoring—that would have addressed any legitimate safety concern without the wholesale exclusion of a competitor from the market. Alternatively, Apple could have temporarily disabled Rave's developer account, which would have prevented future updates and new downloads, but allowed existing users to continue using the software. Any purported procompetitive justification is far outweighed by the substantial harm to competition in the relevant market. Apple's asserted justifications are pretextual and illegitimate.

202. Apple's anticompetitive conduct is ongoing. If Apple is permitted to continue its exclusionary practices, Rave will suffer additional and increasing damage, including irreparable injury to Rave's business and property for which Rave has no adequate remedy at law.

***Second Claim For Relief: Attempted Monopolization of the Market for Smartphones in Violation of Section 2 of the Sherman Act***

203. Plaintiff Rave repeats and realleges all preceding paragraphs as though fully set forth herein.

204. Section 2 of the Sherman Act prohibits any person from attempting to monopolize any part of trade or commerce among the several states. 15 U.S.C. § 2.

205. Smartphones in the United States is a relevant antitrust market and Apple has monopoly power or a dangerous probability of achieving monopoly power in that market.

206. Apple has attempted to monopolize the U.S. smartphone market through a course of exclusionary conduct and anticompetitive acts described herein. Each of Apple's actions individually and collectively increased Apple's market power in the U.S. smartphone market, including but not limited to restrictions Apple imposes on developers and consumers relating to the creation and distribution of apps and technologies that operate across platforms, e.g., super apps, middleware, cloud streaming, and device-agnostic technologies such as Rave.

207. Each of Apple's acts is anticompetitive in its own right, but combined, Apple's course of conduct has a cumulative and self-reinforcing effect that harms competition and the competitive process.

208. Apple's conduct does not reflect competition on the merits. Rather, Apple has acted with specific intent to monopolize and destroy effective competition in the smartphone market in the United States.

209. Compared to the but-for world absent Apple's anticompetitive conduct, customers have less choice and smartphones have lower quality and higher prices, lowering marketwide output.

210. Absent intervention, there is a dangerous probability Apple will achieve monopoly power in the smartphone market in violation of Section 2 of the Sherman Act.

211. As a direct and proximate result of Apple's attempted monopolization of the smartphone market, Rave has suffered antitrust injury, including exclusion from the market for co-viewing apps, destruction of its user base and network effects, lost revenue and profits, suppression of planned growth initiatives, product degradation across all platforms, and irreparable harm to its brand and reputation.

***Third Claim For Relief: Monopolization of the Market for Performance Smartphones in Violation of Section 2 of the Sherman Act***

212. Plaintiff Rave repeats and realleges all preceding paragraphs as though fully set forth herein.

213. Performance smartphones in the United States is a relevant antitrust market and Apple has monopoly power in that market.

214. Apple has willfully monopolized the performance smartphone market in the United States through an exclusionary course of conduct as described herein. Apple's actions

individually and collectively have increased, maintained, or protected its performance smartphone monopoly.

215. Because the U.S. performance smartphone market is a narrower submarket of the relevant market for U.S. smartphones, Apple's anticompetitive acts with respect to the relevant market for U.S. smartphones as discussed above apply with equal force to the relevant market for U.S. performance smartphones. While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

216. Apple's anticompetitive acts have had harmful effects on competition and consumers.

217. Compared to the but-for world absent Apple's anticompetitive conduct, customers have less choice and performance smartphones have lower quality and higher prices, lowering marketwide output.

218. Apple's exclusionary conduct lacks a procompetitive justification that would offset the harm caused by Apple's anticompetitive conduct in violation of Section 2 of the Sherman Act. Apple's asserted justifications are pretextual and illegitimate.

***Fourth Claim For Relief: Attempted Monopolization of the Market for Performance Smartphones in Violation of Section 2 of the Sherman Act***

219. Plaintiff Rave repeats and realleges all preceding paragraphs as though fully set forth herein.

220. Performance smartphones in the United States is a relevant antitrust market and Apple has monopoly power or a dangerous probability of achieving monopoly power in that market.

221. Apple has attempted to monopolize the market for performance smartphones in the United States through an exclusionary course of conduct as described herein. Apple's actions

individually and collectively have increased, maintained, or protected its performance smartphone monopoly in the United States.

222. Because the market for performance smartphones is a narrower submarket of the relevant market for smartphones, Apple's anticompetitive acts with respect to the relevant market for smartphones as discussed above apply with equal force to the relevant market for performance smartphones.

223. While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process. In undertaking this course of conduct, Apple has acted with specific intent to monopolize and to destroy effective competition in the U.S. performance smartphone market. There is a dangerous probability that, unless restrained, Apple will succeed in monopolizing the performance smartphone market in the United States, in violation of Section 2 of the Sherman Act.

224. Compared to the but-for world absent Apple's anticompetitive conduct, customers have less choice and smartphone co-viewing apps have lower quality and higher prices, lowering marketwide output.

225. There is a dangerous probability Apple will successfully achieve monopoly power in the performance smartphone market absent intervention. Rave was the only smartphone co-viewing product that had solved the core technical challenges at scale and achieved sufficient cross-platform adoption to constrain SharePlay.

226. Apple's exclusionary conduct lacks any procompetitive justification that would offset the harm caused by Apple's anticompetitive conduct in violation of Section 2 of the Sherman Act. Apple's asserted justifications are pretextual and illegitimate.

227. As a direct and proximate result of Apple's attempted monopolization, Rave has suffered antitrust injury of the type the antitrust laws are designed to prevent.

### *Fifth Claim For Relief: Monopolization of the Market for Smartphone Co-Viewing Applications in Violation of Section 2 of the Sherman Act*

228. Plaintiff Rave repeats and realleges all preceding paragraphs as though fully set forth herein.

229. Section 2 of the Sherman Act makes it unlawful to "monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2.

230. Smartphone co-viewing apps in the United States is a relevant antitrust market and Apple has monopoly power in that market.

231. Apple has engaged in a sustained course of exclusionary conduct directed at monopolizing the smartphone co-viewing app market in the United States, including: (i) self-preferencing SharePlay through preinstallation and preferential technical access on iPhones; (ii) throttling Rave's downloads on the App Store; (iii) removing Rave from iOS on pretextual grounds; (iv) revoking Rave's developer account; (v) invalidating SIWA credentials for more than 11 million Rave users; and (vi) falsely branding Rave as malware.

232. Apple possesses monopoly power in this market and has demonstrated, through the actions described herein, its substantial ability to control prices, decrease quality, and exclude competition in this market. For example, Apple has demonstrated the power to exclude competition. Apple excluded Rave—the only co-viewing product that had achieved meaningful competitive scale on smartphones—from the App Store. In the absence of Rave, iOS users were left only with SharePlay, an Apple-exclusive feature lacking the interoperability benefits of Rave. The elimination of the only viable cross-platform smartphone co-viewing product from the iPhone constitutes both a reduction in output and a decrease in quality that bifurcates Android

and iOS experiences and prevents users with different device types from engaging in smartphone co-viewing experiences together.

233. Apple holds a dominant share of the smartphone co-viewing market in the United States and substantial barriers to entry exist. SharePlay is preinstalled on every iPhone, enabled by default, and faces no viable competitor on the iPhone following the exclusion of Rave. As explained above, Apple has at least 65 to 70 percent share of smartphones and performance smartphones in the United States. Because SharePlay is preinstalled as the default co-viewing function on 100 percent of iPhones, Apple's share of the smartphone co-viewing market is around 65 to 70 percent (or more).

234. Apple's market share is protected by formidable barriers to entry, including network effects inherent in co-viewing; technical complexity, including real-time synchronization, low-latency networking, cross-platform compatibility, and coordination with content providers' digital-rights-management systems; Apple's technical and contractual restrictions, including its unilateral ability to deny API access, impose arbitrary approval hurdles, degrade performance, or revoke distribution entirely; and Apple's demonstrated willingness to destroy a competitor that achieved meaningful scale.

235. Apple acquired and now maintains its monopoly through a sustained course of exclusionary anticompetitive conduct that eliminated competition and foreclosed entry.

236. This conduct does not reflect competition on the merits. Apple's timing, sequence, and escalation of conduct from throttling downloads of Rave to total exclusion from the App Store are—hallmarks of Apple's deliberate monopolization campaign, not a response to any legitimate compliance concern.

237. Compared to the but-for world absent Apple's anticompetitive conduct, customers have less choice and smartphone co-viewing apps have lower quality and higher prices, lowering marketwide output.

238. Apple's exclusionary conduct lacks any procompetitive justification that offsets the harm caused by Apple's anticompetitive and unlawful conduct. Apple's asserted justifications are pretextual and illegitimate.

239. As a direct, foreseeable, and proximate result of Apple's monopolization of the smartphone co-viewing markets, Rave suffered injury to its business and property, including exclusion from the smartphone co-viewing markets, lost revenue and profits, destruction of its user base, suppression of its planned subscription and marketing initiatives, degradation of its product across all platforms, and irreparable harm to its brand and reputation.

240. Rave's harm is of the type the antitrust laws were designed to prevent: the destruction of a competitor through exclusionary conduct rather than competition on the merits.

***Sixth Claim For Relief: Attempted Monopolization of the Market for Smartphone Co-Viewing Applications in Violation of Section 2 of the Sherman Act***

241. Plaintiff Rave repeats and realleges all preceding paragraphs as though fully set forth herein.

242. Section 2 of the Sherman Act prohibits any person from attempting to monopolize any part of trade or commerce among the several states. 15 U.S.C. § 2.

243. Smartphone co-viewing apps in the United States is a relevant antitrust market and Apple has monopoly power or a dangerous probability of achieving monopoly power in that market.

244. Apple has engaged in a sustained course of exclusionary conduct directed at monopolizing the smartphone co-viewing app market in the United States, including: (i) self-preferencing SharePlay through preinstallation and preferential technical access on iPhones; (ii)

throttling Rave's downloads on the App Store; (iii) removing Rave from iOS on pretextual grounds; (iv) revoking Rave's developer account; (v) invalidating SIWA credentials for more than 11 million Rave users; and (vi) falsely branding Rave as malware.

245. Apple acted with specific intent to monopolize the smartphone co-viewing app market in the United States, as evidenced by its pattern of identifying a threat (Rave), replicating its functionality (SharePlay), and throttling Rave before taking steps to destroy it entirely.

246. There is a dangerous probability Apple will achieve monopoly power in the smartphone co-viewing market in the United States absent intervention. Rave was the only smartphone co-viewing product in the United States that had solved core technical challenges of smartphone co-viewing at scale and achieved sufficient cross-platform adoption to constrain SharePlay.

247. Compared to the but-for world absent Apple's anticompetitive conduct, customers have less choice and smartphone co-viewing apps have lower quality and higher prices, lowering marketwide output.

248. As a direct and proximate result of Apple's attempted monopolization, Rave has suffered antitrust injury of the type the antitrust laws are designed to prevent.

***Seventh Claim For Relief: Tortious Interference with Prospective Economic Advantage***

249. Plaintiff Rave repeats and realleges all preceding paragraphs as though fully set forth herein.

250. At all relevant times, Rave had existing economic relationships with Rave app users and reasonably expected prospective economic relationships with both those users and prospective users. Rave also had and reasonably expected to maintain relationships with advertising partners.

251. Prior to Apple's exclusionary acts, Rave was gaining tens of thousands of new iOS users a day and had plans to accelerate this growth through paid marketing campaigns and a paid premium subscription offering.

252. Apple knew of Rave's prospective economic relationships with both Rave's users and its advertising partners. Apple's review of the Rave App, its study of Rave's functionality in developing SharePlay, and its access to App Store data concerning Rave's download volumes, user growth, and engagement metrics gave Apple detailed knowledge of Rave's existing business trajectory and prospective economic opportunities.

253. Apple nevertheless engaged in wrongful conduct designed to maliciously interfere with Rave's app and advertising customer relationships as described herein, beginning with Apple's efforts to limit Rave's downloads on the App Store and continuing with the termination of Rave's App Store listing, developer account, and related systems permissions on iOS and MacOS, all without legitimate security or other business reasons.

254. Each act constitutes independently wrongful conduct that Apple intended to interfere with Rave's prospective economic relationships. Apple knew that such interference was substantially certain to result in the loss of Rave App users and advertising partners; indeed, that was the very purpose of Apple's conduct. Apple's interference was not justified by any legitimate business purpose.

255. As a direct and proximate result of Apple's intentional interference, Rave has suffered damages, including: (i) lost user acquisition and the associated lifetime revenue of users Rave would have acquired but for Apple's conduct; (ii) lost subscription revenue from Rave's planned premium tier, which Apple's conduct made impossible to launch; (iii) lost advertising revenue attributable to the destruction of Rave's user base and engagement metrics; (iv) lost strategic partnership and investment opportunities attributable to Rave's diminished scale,

growth trajectory, and market credibility; (v) destruction of Rave's enterprise value; and (vi) costs incurred in attempting to mitigate the effects of Apple's interference.

***Eighth Claim For Relief: Unfair Competition***

256. Plaintiff Rave repeats and realleges all preceding paragraphs as though fully set forth herein.

257. As set forth in detail above, Apple has committed one or more illegal acts, including, among others, violations of antitrust law and false and defamatory statements.

258. Defendant's conduct is contrary to honest practice in commercial matters and interferes with Plaintiff's ability to conduct their business, including Plaintiff's ability to attract and retain users and to scale its apps.

259. Defendant's conduct threatens an incipient violation of the antitrust laws or violates the policy and spirit of those laws.

260. Apple's conduct substantially injured consumers and competition, and any purported benefit of Apple's conduct is far outweighed by the gravity of the harm imposed.

261. Defendant's wrongful conduct has caused and will continue to cause Plaintiff significant commercial harm.

***Ninth Claim For Relief: New Jersey Antitrust Act***

262. Plaintiff Rave repeats and realleges all preceding paragraphs as though fully set forth herein.

263. Section 56:9-4 of the New Jersey Antitrust Act makes it unlawful for any person to monopolize, attempt to monopolize, or combine or conspire to monopolize trade or commerce in any relevant market within the State.

264. The smartphone market, the performance smartphone market, and the smartphone co-viewing app market are each a relevant product market for purposes of the New Jersey Antitrust Act.

265. As set forth in detail above, Defendant unlawfully and in violation of the New Jersey Antitrust Act § 56:9–4 willfully monopolized and/or attempted to monopolize the smartphone, performance smartphone, and smartphone co-viewing app markets in the United States.

266. Defendant's wrongful conduct has caused and will continue to cause Plaintiffs significant commercial harm.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Rave prays that this Court grant the following relief:

a. A permanent injunction enjoining Defendant Apple from repetition of acts similar to the wrongful acts described above and ordering Apple to:

   i. restore Rave to the App Store on terms no less favorable than those applicable to comparable applications;

   ii. reinstate Rave's developer account and associated credentials;

   iii. remove all false malware designations and security warnings directed at Rave from macOS and any other Apple platform or system;

   iv. issue a corrective notification to affected users clarifying that Rave does not contain malware and does not damage their computers;

   v. restore SIWA credentials and login functionality for Rave users whose accounts were invalidated;

   vi. cease algorithmic suppression of Rave on the in App Store;

   vii. cease publishing any false or misleading statements concerning Rave; and

viii. cease any other conduct that has the purpose or effect of excluding Rave from competition in the co-viewing market

b. A money judgment against Defendant Apple for that amount of ordinary damages, trebled damages, punitive damages, and/or restitution, in an amount to be determined at trial;

c. Pre- and post-judgment interest;

d. Costs of the suit, including reasonable attorneys' fees and expenses; and

e. Such other relief as the Court deems equitable and proper.

## **DEMAND FOR JURY TRIAL**

Rave hereby demands a trial by jury.

Dated: May 7, 2026

/s/ *Katherine A. Escanlar*
Katherine A. Escanlar
Jakob B. Halpern
SAIBER LLC
7 Giralda Farms, Suite 360
Madison, NJ 07940
(973) 622-3333
kescanlar@saiber.com
jhalpern@saiber.com

James K. Hunsberger (*pro hac vice forthcoming*)
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
(202) 912-4700
jhunsberger@axinn.com

Kristyn L. Hansen (*pro hac vice forthcoming*)
AXINN, VELTROP & HARKRIDER LLP
630 Fifth Avenue, 33rd Floor
New York, NY 10111
(212) 728-2200
khansen@axinn.com

*Attorneys for Plaintiff Rave Inc.*

## LOCAL CIVIL RULES 11.2 AND 40.1 CERTIFICATION

Pursuant to Local Civil Rules 11.2 and 40.1, the undersigned counsel hereby certifies that this matter in controversy is related to and shares common questions of fact with the multi-district litigation styled as *In Re: Apple Inc. Smartphone Antitrust Litigation,* 2:24-md-03113 (JXN) (LDW) and *United States v. Apple Inc.*, 2:24-cv-04055 (JXN) (LDW).

I further certify that, to the best of my knowledge, the matter in controversy is not the subject of any other action pending in any other court, or of any pending arbitration or administrative proceeding.

Dated: May 7, 2026

Respectfully submitted,

SAIBER LLC
*Attorneys for Plaintiff Rave Inc.*

*By: /s/ Katherine A. Escanlar*

Katherine A. Escanlar
Jakob B. Halpern
7 Giralda Farms, Suite 360
Madison, NJ 07940
(973) 622-3333
kescanlar@saiber.com
jhalpern@saiber.com

## LOCAL CIVIL RULE 201.1 CERTIFICATION

Under Local Civil Rule 201.1, the undersigned counsel hereby certifies that Rave seeks both monetary damages greater than $150,000 and injunctive and other equitable relief, and therefore this action is not appropriate for compulsory arbitration.

Dated: May 7, 2026

Respectfully submitted,

SAIBER LLC
*Attorneys for Plaintiff Rave Inc.*

*/s/ Katherine A. Escanlar*

Katherine A. Escanlar
Jakob B. Halpern
7 Giralda Farms, Suite 360
Madison, NJ 07940
(973) 622-3333
kescanlar@saiber.com
jhalpern@saiber.com